DUKE POWER COMPANY, Petitioner,

v.

FEDERAL ENERGY REGULATORY
COMMISSION, Respondent,

North Carolina Municipal Power Agency
Number 1, Piedmont Municipal Power
Agency, North Carolina Electrical
Membership Corporation, and Saluda
River Electrical Cooperative, Inc., In-
tervenors.

No. 87–1781.

United States Court of Appeals,
District of Columbia Circuit.

Argued Oct. 20, 1988.

Decided Jan. 6, 1989.

Steven C. Griffith, Jr., with whom Ellen T. Ruff, Richard M. Merriman, John D. McGrane, and William M. Dudley, Washington, D.C., were on the brief, for petitioner.

Hanford O'Hara, Atty., F.E.R.C., with whom Catherine C. Cook, Gen. Counsel, and Jerome M. Feit, Sol., F.E.R.C., Washington, D.C., were on the brief, for respondent.

Gary J. Newell, with whom James N. Horwood, Barbara S. Esbin, Washington, D.C., Robert T. Bockman, Columbia, S.C., Thomas J. Bolch, Raleigh, N.C., William T. Miller, and Jonathan S. Liebowitz were on the brief, for intervenors.

Before WALD, Chief Judge, and MIKVA and SENTELLE, Circuit Judges.

Opinion for the Court filed by Circuit Judge MIKVA.

MIKVA, Circuit Judge:

The issues presented by this case are whether the respondent Federal Energy Regulatory Commission ("FERC" or "Commission") properly interpreted certain agreements between petitioner and intervenors and whether the Commission properly retained jurisdiction to decide the dispute despite an arbitration clause in the agreements.

Petitioner Duke Power Co. ("Duke") seeks review of Commission orders granting summary judgment for intervenors, 40 F.E.R.C. ¶ 61,138 (1987), and denying rehearing, 41 F.E.R.C. ¶ 61,060 (1987). Intervenors North Carolina Municipal Power Agency No. 1 ("Power Agency"), Piedmont Municipal Power Agency ("Piedmont"), North Carolina Electric Membership Corp. ("NCEMC"), and Saluda River Electric Cooperative, Inc. ("Saluda") (collectively "complainants") had alleged that Duke had improperly charged them costs booked to Account 407 of the Commission's Uniform System of Accounts, 18 C.F.R. Part 101, Account 407. The Commission, relying in part on its policy not to allow such costs without prior approval, held that the charges were unauthorized and ordered Duke to refund the improperly charged amounts.

In this petition, Duke contends that the Commission should have submitted the dispute to arbitration, should not have granted summary judgment for complainants, and retroactively applied to Duke its policy regarding Account 407 costs. Because we find that the interconnection agreements ("agreements") between Duke and complainants, on their face, do not permit recovery of Account 407 costs, we conclude that the Commission's interpretation of the agreements was reasonable. We also hold that the Commission's acceptance for filing of an agreement containing an arbitration

clause does not disable the Commission from the enforcement of filed rate schedules and that therefore the Commission properly retained jurisdiction in this case to resolve the instant dispute. Because our holdings do not depend on whether the Commission properly relied on its policy regarding Account 407 costs, we do not reach Duke's retroactivity argument. Accordingly, we deny Duke's petition for review.

## I. BACKGROUND

In 1978 and 1980, Duke and complainants entered into separate but substantially similar interconnection agreements relating to the supply of supplemental and reserve capacity and energy from Duke's Catawba Nuclear Generating Station. The agreements, entered into after extensive negotiations, were part of larger overall arrangements among the companies for ownership and utilization of certain nuclear power facilities. The power exchange provisions in the agreements became effective on various dates between July 1983 and June 1985.

The agreements contain formula rate schedules that detail the methodology used to calculate the charges for capacity and energy sold under the agreements. The costs that Duke may recover for the services sold to complainants are contained in numerous exhibits that refer to specific accounts under the Commission's Uniform System of Accounts. Costs properly charged by Duke to the specified accounts are recoverable from complainants; costs charged by Duke to accounts not so specified are not recoverable.

The agreements also contain an arbitration clause, which provides in relevant part:

> *any* unresolved dispute arising out of or relating to the matters set forth in this Agreement shall be settled by arbitration in accordance with the procedures set forth in this Article * * *. In addition, disputes relating to the arbitration provisions of this Agreement, *including* without limitation *disputes as to the applicability of such provisions to a particular dispute*, shall be submitted for arbitration.

Duke Power Company/North Carolina Power Agency Number 1, Restated Interconnection Agreement § 24.1 (June 21, 1982) (emphasis added), Joint Appendix ("J.A.") at 249.

The agreements were filed with the Commission and accepted by letter order. From the commencement of service to each complainant, Duke included charges for costs booked to Account 407 ("Amortization of property losses, unrecovered plant and regulatory study costs") in its calculation of rates for supplemental and reserve capacity. These charges represented a share of the amortization of certain losses incurred by Duke, primarily in 1982 and 1983, in connection with its cancelled Perkins and Cherokee nuclear generating projects.

In 1983, when Power Agency first began to receive power under its interconnection agreement with Duke and Duke began to charge Power Agency for costs booked to Account 407, Power Agency objected on the ground that the agreement did not provide for the recovery of such costs. In January 1987, after unsuccessfully attempting to resolve the dispute informally, Power Agency filed a complaint and motion for summary judgment with the Commission, alleging that Duke violated the filed rate doctrine by improperly including Account 407 costs in its charges to Power Agency under their interconnection agreement.

In March 1987, Piedmont and NCEMC filed similar complaints and motions for summary judgment against Duke. In April 1987, Saluda, arguing that its interconnection agreement with Duke was identical in all material respects to those of Power Agency, Piedmont, and NCEMC, moved to intervene and join with the three complainants as a co-complainant in their respective complaint proceedings.

On August 3, 1987, the Commission consolidated the complaints and held that, because Commission policy was that Account 407 expenses were not recoverable absent prior Commission approval, and because

Duke had failed to obtain such approval, "submitting the instant dispute to arbitration would be a waste of time and resources and would only serve to delay our resolution of the matter." 40 F.E.R.C. ¶ 61,138, at 61,404 (1987). The Commission also found that "[t]he agreements are clear and unambiguous, and Duke's formula rates do not provide for recovery of amounts booked to Account No. 407." *Id.* Accordingly, the Commission declined to order arbitration, granted complainants' motions for summary judgment, and ordered Duke to refund, with interest, the unauthorized charges—over $36 million—to complainants.

On October 22, 1987, the Commission denied Duke's petition for rehearing. 41 F.E.R.C. ¶ 61,060, at 61,174 (1987). This petition for review followed.

## II. DISCUSSION

The central issue in this case is whether Duke was authorized to recover from complainants costs booked to Account 407. Because we find that the Commission properly concluded that Duke was not so authorized, we deny Duke's petition for review without ruling on the Commission's policy regarding Account 407 costs and the attendant retroactivity issue.

### A. *Account 407 Costs*

The Commission's interpretation of a utility contract subject to its jurisdiction is entitled to deference if reasonable—i.e., if "amply supported both factually and legally." *Vermont Department of Public Service v. FERC,* 817 F.2d 127, 134 (D.C.Cir. 1987) (quoting *Kansas Cities v. FERC,* 723 F.2d 82, 87 (D.C.Cir.1983)); *National Fuel Gas Supply Corp. v. FERC,* 811 F.2d 1563, 1568–72 (D.C.Cir.), *cert. denied,* —— U.S. ——, 108 S.Ct. 200, 98 L.Ed.2d 151 (1987); *cf. Chevron U.S.A. Inc. v. NRDC,* 467 U.S. 837, 842–43, 104 S.Ct. 2778, 2781–82, 81 L.Ed.2d 694 (1984).

We recently noted, however, that "the courts still play a vital role in reviewing an agency interpretation of a technical contract provision." *Tarpon Transmission Co. v. FERC,* 860 F.2d 439, 442 (D.C.Cir.

1988). We explained that "[w]e cannot accept an agency determination unless it is the result of reasoned and principled decisionmaking that can be ascertained from the record. To do otherwise would transform judicial review into a process of rubberstamping unsupported, and perhaps unsupportable, agency decisions." *Id.* (citation omitted).

■ Reviewing the record and the agency's interpretation under these standards, we find ample factual and legal support for the Commission's interpretation of the interconnection agreements between Duke and complainants. Indeed, because we find that the relevant terms of the agreements are clear and unambiguous, we need not consider extrinsic evidence of intent offered by Duke in support of its proposed construction. *See Papago Tribal Utility Authority v. FERC,* 723 F.2d 950, 955 (D.C.Cir.1983), *cert. denied,* 467 U.S. 1241, 104 S.Ct. 3511, 82 L.Ed.2d 820 (1984).

Duke's primary argument is that the formula rate schedules contained in the interconnection agreements implicitly permit the recovery of Account 407 charges. The agreements provide that the charges for reserve capacity and supplemental capacity are to be calculated in accordance with section 17.2 and Exhibit IC–I of the agreements. J.A. at 246 (references are to the Duke–Power Agency agreement for convenience only). Under Exhibit IC–I, the reserve capacity monthly charge and supplemental capacity monthly charge are determined via a series of formula rate calculations, one element of which is Duke's return on investment. *See* J.A. at 251–53. It is undisputed that none of the exhibits used for these calculations explicitly provides for the charging of amounts booked to Account 407.

What is disputed is Duke's contention that Account 407 costs may properly be charged because they are implicitly included in the calculation of Duke's return on investment. Duke argues that, because its return on investment is derived from its composite cost of capital, J.A. at 254, which in turn requires determining Duke's actual

experienced return on its common equity investment, J.A. at 255, Duke is authorized to charge Account 407 costs because an element of this actual experienced return is its electric operating income, which expressly includes Account 407 costs, J.A. at 256 ("Exhibit IC–I–29").

The Commission, however, rejected this argument, explaining that:

> The agreements are clear and unambiguous, and Duke's formula rates do not provide for recovery of amounts booked to Account No. 407. Duke is incorrect in its claim that, since Account No. 407 is an implicit part in computing Duke's earned return on equity, Account No. 407 may be charged as an expense. It simply does not follow that the use of the net operating income figure from the [FERC] Form No. 1 as the contractual basis for computing return on equity permits Duke to charge as expenses all items used in computing net income when such expenses are not explicitly provided for in the formula. *The formulas contain explicit detail on the specific expenses to be charged, and simply do not provide for recovery of amounts booked to Account No. 407.*

40 F.E.R.C. ¶ 61,138, at 61,404 (1987) (emphasis added); *see also* 41 F.E.R.C. ¶ 61,060, at 61,175 (1987) ("the agreements are clear and unambiguous and do not provide for recovery of amounts booked to Account No. 407").

■ We agree with the Commission's analysis. Duke's reliance on Exhibit IC–I–29 to prove that Account 407 charges are recoverable is misplaced. Exhibit IC–I–29 serves the limited purpose of setting forth the basis for determining the rate of return on common equity that will be included in the overall cost of capital from which a return allowance can be calculated. Account 407 costs are included in the operating income calculation because Duke's revenues, from which amortization and other costs are deducted to compute operating income, include the amounts actually recovered by Duke through rates for those costs. Exhibit IC–I–29 does not purport to delineate the range of allowable expenses

that may be charged to complainants, and Duke's invocation of that exhibit for that purpose is therefore improper. Indeed, if Duke were correct that all charges included in the electric operating income total were recoverable, then there would be little need for many of the detailed and numerous exhibits that identify the specific costs that may properly be charged to complainants. Moreover, to the extent that we are to accord deference to the Commission's greater expertise in this technical area, *see National Fuel Gas Supply Corp.*, 811 F.2d at 1570, the Commission's interpretation confirms our view that the interconnection agreements do not authorize Duke to recover Account 407 costs from complainants. Accordingly, we hold that the Commission's interpretation of the interconnection agreements is reasonable and that therefore the Commission properly granted complainants' motions for summary judgment.

■ Duke argues further, however, that the inclusion of Account 407 expenses in Exhibit IC–I–29 creates an imbalance between the return and expense sections that can only be restored by fully reflecting the effect of the abandoned plants. The short answer to this argument is simply that, notwithstanding any alleged "imbalance" that would result, the agreements, on their face, make no provision for the recovery of Account 407 costs. As the Commission recognized, the expense and return sections, though related, serve fundamentally different purposes. The inclusion of Account 407 costs in the calculation of operating income does not necessarily presuppose that such costs are recoverable. We are therefore unpersuaded by Duke's naked assertion that the Commission's interpretation creates an imbalance, when to adopt Duke's interpretation would require us to ignore the clear indication in the language of the agreements that Account 407 expenses are not recoverable.

Duke also asserts that, even if the agreements do not specifically provide for the recovery of Account 407 expenses, the agreements expressly contemplate the recovery of new charges and expenses, which

would include Account 407 expenses. Duke points to an introductory paragraph in Exhibit IC–I–2 ("General Information"), which states:

> The rates described in this Exhibit include factors which will recover taxes, fees, assessments, and other expenses and adjustments. The factors would cover such items existing at the commencement of transactions hereunder and *would be adjusted as necessary to reflect* (1) any applicable changes in such existing taxes, fees, assessments, *and other expenses and adjustments* and (2) *the imposition of such new applicable charges.*

Duke Power Company/North Carolina Power Agency Number 1, Restated Interconnection Agreement, Exhibit IC–I–2 (June 21, 1982) (emphasis added), J.A. at 250. Duke claims that the references to "other expenses" and "new applicable charges" in this provision include Account 407 expenses, because the parties intended that Account 407 expenses be part of "system average costs." Duke also alleges that the Commission's order is defective because it fails to explain why the Commission rejected, if it considered at all, this particular interpretation of the agreements.

■ We do not see how this provision can reasonably be interpreted to authorize recovery of Account 407 costs. The agreements include allowances for certain taxes, fees, and assessments that are related to revenues or kilowatt-hour sales. *See, e.g.,* Exhibit IC–I–13 note B, J.A. at 252. But the paragraph cited by Duke simply states the natural implication that these factors will be adjusted as necessary to reflect changes in or additions to the underlying taxes, fees, and assessments already included in the formula rate schedules. The provision cannot reasonably be read to authorize Duke to charge costs that are otherwise excluded from the agreements. Indeed, it would be inconsistent with the use of numerous exhibits detailing the specific formula rate methodology if this provision (or any other provision) were to permit a party, unilaterally, to add new categories of costs to be factored into the rate charged. We therefore reject Duke's inter-

pretation of this provision as unreasonable and need not consider Duke's discussion of "system average costs" and citations to extrinsic evidence to aid our interpretation of this provision. *See Papago Tribal Utility Authority v. FERC,* 723 F.2d 950, 955 (D.C.Cir.1983), *cert. denied,* 467 U.S. 1241, 104 S.Ct. 3511, 82 L.Ed.2d 820 (1984).

We are mindful of the Commission's failure to respond specifically to the "other expenses" and "new applicable charges" argument in its orders. We note, however, that Duke did not elaborate on this argument before the Commission, *see* J.A. at 232 (answer to Power Agency complaint), 234 (same), 337 (answer to NCEMC complaint), 388 (request for rehearing), and, given its lack of merit, we find it reasonable to assume that the Commission implicitly rejected the argument when it concluded that the agreements did not authorize recovery of amounts booked to Account 407. 40 F.E.R.C. ¶ 61,138, at 61,404 (1987); *see also* 41 F.E.R.C. ¶ 61,060, at 61,175 (denying rehearing). To be sure, our task of reviewing the Commission's decisions would be made easier if the Commission thoroughly disposed of every contrary argument, but such meticulousness is neither required nor expected of the Commission. The standard for adequate explanation remains stringent, *see Columbia Gas Transmission Corp. v. FERC,* 628 F.2d 578, 593 (D.C.Cir.1979) (vacating Commission order for inadequate explanation of its decision), but we find in the instant case that the Commission's orders pass muster.

■ Finally, Duke argues that, even if there is not enough evidence to show that the Commission's decision on the merits was erroneous, there is at least sufficient dispute over the intent of the parties to require an evidentiary hearing. But "[a] contract is not ambiguous simply because the parties disagree on its interpretation." *Papago Tribal Utility Authority,* 723 F.2d at 955 (quoting *Clayman v. Goodman Properties, Inc.,* 518 F.2d 1026, 1034 (D.C. Cir.1973)). Because we agree with the Commission that the relevant terms of the agreements are clear and unambiguous, i.e., not reasonably susceptible of different

constructions or interpretations, *id.* (quoting *Lee v. Flintkote Co.,* 593 F.2d 1275, 1282 (D.C.Cir.1979)), Duke is precluded from using extrinsic evidence of intent to interpret the agreements. *Id.* We therefore agree with the Commission's determination that no genuine issue of material fact had been presented, 40 F.E.R.C. ¶ 61,138, at 61,404 (1987), because the agreements could be interpreted as a matter of law. *See Appalachian Power Co. v. Federal Power Commission,* 529 F.2d 342, 351 (D.C.Cir.), *cert. denied,* 429 U.S. 816, 97 S.Ct. 58, 50 L.Ed.2d 76 (1976). Accordingly, and in light of the narrow standard of review for denial of an evidentiary hearing, *see Kansas Power & Light Co. v. FERC,* 851 F.2d 1479, 1484 (D.C.Cir.1988) ("mere allegations of disputed facts are insufficient to mandate a hearing"); *Vermont Department of Public Service v. FERC,* 817 F.2d 127, 140 (D.C.Cir.1987) ("Without evidence of an abuse of discretion, we defer to an agency's determination that a controversy raises no such issues [of material fact]."), we decline Duke's request for an evidentiary hearing and uphold the Commission's decision to grant summary judgment for complainants.

B. *Arbitration*

Duke also maintains that the Commission should have given effect to the mandatory arbitration clause in the agreements and that, particularly in light of public and Commission policies favoring arbitration, *see, e.g., Shearson/American Express, Inc. v. McMahon,* 482 U.S. 220, 107 S.Ct. 2332, 2337, 96 L.Ed.2d 185 (1987); *American Municipal Power–Ohio, Inc. v. Ohio Edison Co.,* 42 F.E.R.C. ¶ 61,140 (1988), the Commission therefore erred in not doing so.

The Commission ruled that arbitration would be "a waste of time and resources" in light of Duke's failure to comply with Commission policy disallowing recovery of Account 407 expenses absent prior Commission approval. 40 F.E.R.C. ¶ 61,138, at 61,404 (1987) (citing *South Carolina Generating Co.,* 32 F.E.R.C. ¶ 61,224 (1985); *Orange and Rockland Utilities, Inc.,* 37 F.E.R.C. ¶ 61,326 (1986)). The Commission

also relied, however, on its interpretation of the agreements as "clear and unambiguous" in rejecting arbitration and granting summary judgment for complainants. *See id.* ("*for all the foregoing reasons* we shall grant the Complainants' motions for summary disposition") (emphasis added); *see also* 41 F.E.R.C. ¶ 61,060, at 61,175 (1987) ("*Moreover,* as we noted in our earlier order, the agreements are clear and unambiguous and do not provide for recovery of amounts booked to Account No. 407.") (emphasis added).

As a threshold matter, we find that despite the presence of an arbitration clause in the agreements, the Commission properly retained jurisdiction over the subject matter of this dispute. It is uncontested, and indeed the agreements themselves so provide, that the Commission has continuing regulatory jurisdiction over rates charged under the agreements. *See* J.A. at 248. Complainants had alleged that Duke had violated the terms of the rate schedules on file with the Commission. Because the enforcement of filed rate schedules is a matter distinctly within the Commission's statutory mandate, *see* 16 U.S.C. § 824d; 18 C.F.R. § 35.1(e); *Montana–Dakota Utilities Co. v. Northwestern Public Service Co.,* 341 U.S. 246, 251–52, 71 S.Ct. 692, 695–96, 95 L.Ed. 912 (1951) (articulating filed rate doctrine), the Commission has an independent regulatory duty to remedy a utility's violation of its filed rate schedule. We therefore hold that the Commission's acceptance for filing of an agreement that contains an arbitration clause does not legally disable the Commission from resolving disputes at the core of its enforcement mission.

In so holding, we adopt the reasoning of the Third Circuit in *Gulf Oil Corp. v. Federal Power Commission,* 563 F.2d 588, 596–97 (3d Cir.), *cert. denied,* 434 U.S. 1062, 98 S.Ct. 1235, 55 L.Ed.2d 762 (1977). In *Gulf Oil,* the court declined to order arbitration of a dispute involving a gas producer's certificate of public convenience and necessity, even though the certificate had been granted on the basis of a contract containing a mandatory arbitration clause.

The court, affirming a decision of the Federal Power Commission ("FPC") to refuse to defer to arbitration, reasoned that:

> The FPC is charged with the public responsibility to enforce the certificate, and in the performance of its duty, the Commission necessarily must resort to the terms of the contract. But this does not mean that the Commission becomes in any sense a party to the contract bound by the mutual obligations between the parties themselves. *The reciprocal promises between [the contracting parties] to resolve their disputes by arbitration are inapplicable to the Commission's duty to enforce the certificate of public convenience.*

*Id.* (emphasis added). The court added that arbitration of the dispute would also waste time and money, because the agency, as petitioner had conceded, would not necessarily be bound by any resulting decision. *Id.* at 597. For these same reasons, we find that the Commission in this case is not jurisdictionally precluded from enforcing a violation of a filed rate schedule simply because it accepted for filing an agreement containing an arbitration clause.

Duke suggests that *Gulf Oil* is distinguishable because the Commission's involvement in issuing a certificate of convenience is significantly greater than in accepting for filing as a rate schedule a contract between two parties. We decline to follow Duke's suggestion, however, because we find no qualitative difference in enforcement responsibility. In both instances, the Commission is "charged with the public responsibility" of enforcing a utility's commitments, *id.* at 596, and, in both instances, the utility's violation of its commitments has serious implications for the public interest.

Duke further asserts that the nature of the breach alleged in *Gulf Oil* (underdeliveries of needed gas) added a measure of urgency to the situation that is not present in this case. *See Gulf Oil,* 563 F.2d at 597 ("We do not see the purpose to be served, however, in a lengthy delay of FPC action in this *urgent* matter pending arbitration when the FPC, even under Gulf's view, would ultimately be free to ignore completely the arbitration results.") (emphasis added). Our reading of *Gulf Oil,* however, convinces us that the *Gulf Oil* court did not rely heavily, if at all, on that factor. Rather, we think that a more reasonable reading of the above-quoted passage in its context is that, because the agency would be free to ignore the arbitration results, arbitrating the dispute would serve no purpose, even if the matter were not urgent. We therefore reject Duke's attempt to distinguish *Gulf Oil* and the instant case.

Having made this threshold jurisdictional determination, we conclude that if the Commission finds a violation of the filed rate doctrine, it is not required to submit the dispute to arbitration despite a mandatory arbitration clause in the agreements constituting the filed rate schedule, although it may, in its discretion, do so. In the case *sub judice,* we therefore hold that the Commission acted within its discretion in declining to submit the instant dispute to arbitration. Although the Commission acknowledged its policy of encouraging arbitration of disputes, 40 F.E.R.C. ¶ 61,138, at 61,404 (1987), once it found that Duke had violated its filed rate schedule, the Commission was thereafter not obligated to give effect to the arbitration clause. The Commission recognized that a two-step procedure would add needless cost and delay to the proceeding, given that it would not necessarily be constrained by any decision rendered by arbitration. *Cf. Carey v. Westinghouse Electric Corp.,* 375 U.S. 261, 272, 84 S.Ct. 401, 409, 11 L.Ed.2d 320 (1964) (National Labor Relations Board may, but need not, defer to arbitrator's decision). Moreover, although arbitration is particularly useful for resolving disputed factual matters, *see, e.g., Texas–New Mexico Power Co. v. El Paso Electric Co.,* 30 F.E.R.C. ¶ 61,242 (1985), we find in this case that the agreements were clear on their face and could be interpreted without resort to extrinsic evidence, *see Vermont Department of Public Service v. FERC,* 817 F.2d 127, 140 (D.C.Cir.1987); *Papago Tribal Utility Authority v. FERC,* 723 F.2d 950, 955 (D.C.Cir.1983), *cert. denied,* 467 U.S. 1241, 104 S.Ct. 3511, 82 L.Ed.2d 820 (1984). The

assistance of an arbitrator was therefore neither required nor necessary to interpret the rate schedules. Under these circumstances, we hold that the Commission was within its discretion in not ordering arbitration of the dispute.

In so holding, we do not give the Commission a license to disregard mandatory arbitration clauses in routine contract disputes. We affirm that "[i]n construing the [Natural Gas] Act, we should bear in mind that it evinces no purpose to abrogate private rate contracts as such." *United Gas Pipe Line Co. v. Mobile Gas Service Corp.,* 350 U.S. 332, 338, 76 S.Ct. 373, 378, 100 L.Ed. 373 (1956); *see also City of Cleveland v. Federal Power Commission,* 525 F.2d 845, 854–55 (D.C.Cir.1976). The facts of this case constitute an exception, however, because although "the Natural Gas Act permits the relations between the parties to be established initially by contract, the protection of the public interest [is] afforded by supervision of the individual contracts, which to that end must be filed with the Commission and made public," *United Gas Pipe Line Co.,* 350 U.S. at 339, 76 S.Ct. at 378. In short, because the Commission has an independent interest as a regulatory body in prohibiting utilities from charging other than their filed rates, Duke's violation of the interconnection agreements effectively converted the Account 407 dispute from one between Duke and complainants to one between Duke and the Commission.

Our decision today to uphold the Commission's decision not to order arbitration therefore derives entirely from the Commission's duty to enforce filed rate schedules. Given our finding that the agreements clearly and unambiguously did not authorize Duke to recover Account 407 costs, we need not pass on the Commission's reliance on its policy to deny arbitration. Accordingly, we hold that the Commission properly exercised jurisdiction over the dispute and properly declined to order arbitration.

## C. *Retroactivity*

■ Duke's final argument is that the Commission retroactively applied to Duke

its policy requiring prior approval and in so doing violated the filed rate doctrine. Duke contends that the policy at issue was not articulated until after Duke and complainants entered into their agreements and after Duke began charging the Account 407 costs to complainants. *Cf. South Carolina Generating Co.,* 32 F.E.R.C. ¶ 61,224 (1985); *Orange and Rockland Utilities, Inc.,* 37 F.E.R.C. ¶ 61,326 (1986).

Whatever the merits of this argument, however, we need not resolve it today. Although the Commission relied primarily on its allegedly retroactive policy to deny arbitration, we affirm the Commission's decision not to order arbitration on the basis of its secondary rationale that the agreements clearly and unambiguously did not allow Duke to recover Account 407 costs from complainants, *see Vermont Department of Public Service v. FERC,* 817 F.2d 127, 140 (D.C.Cir.1987); *Papago Tribal Utility Authority v. FERC,* 723 F.2d 950, 955 (D.C. Cir.1983), *cert. denied,* 467 U.S. 1241, 104 S.Ct. 3511, 82 L.Ed.2d 820 (1984). Because we conclude that this rationale is a sufficient reason for declining to order arbitration, we need not decide whether the Commission's application of policy to Duke was retroactive.

We note in passing that the Commission's order requiring Duke to refund the unauthorized charges does not implicate, and therefore is not precluded by, the retroactivity provisions of sections 205 and 206 of the Federal Power Act, 16 U.S.C. §§ 824d–824e. As the Commission held, "Duke's claim that such a change in a filed rate can only be made prospectively after a section 206 proceeding is only relevant if we assume that the filed rates permitted the recovery of amounts booked to Account No. 407 in the first instance. They do not." 41 F.E.R.C. ¶ 61,060, at 61,175 (1987). We therefore conclude that the Commission properly granted summary judgment for complainants and properly denied rehearing.

## III. CONCLUSION

In light of the clear and unambiguous terms of the relevant portions of the inter-

connection agreements, we find the Commission's interpretation "amply supported both factually and legally," *Vermont Department of Public Service*, 817 F.2d at 134. Because the Commission reasonably interpreted the interconnection agreements as not authorizing Duke to recover Account 407 costs from complainants, and because the Commission properly exercised jurisdiction in this case, we affirm the Commission's orders granting summary judgment for complainants. We do not reach either the Commission's contention that Duke's charges were unauthorized because they violated Commission policy requiring prior approval or Duke's assertion that this policy was applied against Duke retroactively. Accordingly, the petition for review is

DENIED.